CHASEZ, Judge.
Mrs. Clarice Addington sued to recover damages for personal injuries she suffered when an automobile in which she -was a guest passenger crashed into a telephone pole. Joined as defendants were James L. Rike, the driver of the automobile; The American Insurance Company of Newark, N. J., the insurer of the automobile driven by Rike but owned by another person; and Traders & General Insurance Co., Rike’s own automobile liability insurer.
From a judgment rejecting her demand, plaintiff appeals. The appeal as to Traders & General Insurance Company has been dismissed on joint motion of plaintiff and that insurer.
The record shows that Rike called for Mrs. Addington, a social acquaintance, at about 9:00 p. m., on October 28, 1961, and they proceeded immediately to a mid-town New Orleans cocktail lounge. There they had some alcoholic drinks, and joined in singing and maraca playing about a piano bar. At about midnight they went to another lounge or night club in the French Quarter, where they again had drinks and sang and played maracas about a piano bar. At about 3:00 or 4:00 a. m., they left that lounge and began to drive home.
While driving along Canal Street towards Lake Pontchartrain, Rike lost control of the automobile just past the intersection of White Street, where streetcar spur tracks from the Canal Street neutral ground cross, the roadway and lead to the streetcar barns- and yards. Rike allowed the car to leave the left lane of the roadway and mount the neutral ground, where it crashed into a telephone pole situated about two feet from the roadway. Plaintiff’s injuries were sustained in the crash.
It is apparent that a prima facie case in plaintiff’s favor is established, since she shows her guest passenger status and Rike’s-failure to maintain control so as to avoid the crash.
*192 At time of trial the defendants’ position was (1) Rike was not negligent, but drove upon the neutral ground in a reasonably prudent effort to avoid a sudden emergency created when a car proceeding in the right lane of the same roadway moved towards the left lane, in which Rike was driving; or (2) if Rike was negligent, his negligence is attributable to his having imbibed to such an extent that his mental and physical faculties were materially impaired; and plaintiff knew or should have known of that impairment and therefore assumed the risk of riding with him.
The argument that Rike was not at all negligent appears to have been abandoned by defendants; and in any event the testimony related to that argument does not suggest the immediacy of danger which might have excused Rike’s driving upon the neutral ground.
Defendants’ real argument on appeal is that Rike was negligent in driving while his competence to do so was impaired by drink, and that plaintiff, having been in his company for seven hours during the course of the evening, was or should have been aware of his condition and should therefore have declined to ride with him.
Plaintiff has established a prima facie case for recovery of damages caused by Rike’s negligence in leaving the roadway and colliding with the telephone pole on the neutral ground. Defendants admit negligence but insist that the cause of the lack of control of the car was a deteriorated state of Rike’s mind and body caused by drink, so that the fundamental negligence of Rike was driving while materially under the influence of alcohol. Defendants further insist that plaintiff knew Rike was so under the influence of alcohol. We believe defendants’ position constitutes an affirmative defense, as to which they bear the burden of proof.
The only pertinent testimony on the issue of the effect of alcohol on Rike, and of plaintiff’s knowledge of that effect, was that of Rike, of plaintiff, and of the police officer who investigated the accident.
 Rike testified he and plaintiff had at least five drinks in the first lounge and as many or more in the second, or a total of at least ten drinks over a seven hour period. Plaintiff testified they each had one or two drinks at the first stop, and two or three at the second. We conclude that, even accepting Rike’s estimate, we cannot say as a matter of law that ten drinks over a seven hour period would necessarily so affect any man as “to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired,” as our jurisprudence describes the pertinent state of being under the influence of alcohol; see Otis v. New Orleans Public Service, Inc., 127 So.2d 197 (199) (La.App.1961) and the many authorities there cited. If that state of impairment exists, the fact that it results from very few drinks is immaterial; Elba v. Thomas, 59 So.2d 732, 735-736 (La.App.1952). By the same rule, of course, if that state of impairment does not exist, the fact that many drinks have been consumed is immaterial. It is the impairment of the faculties which proximately cause an accident, by depriving the driver of normal control. We might suppose that, at some point the quantity alone would suffice, as a matter of law, to prove lack of normal control; perhaps no one could argue that 100 drinks in seven hours would impair any man’s normal responses. But we are unable to say that ten drinks in seven hours renders a man incompetent to drive, as a matter of law.
As a matter of fact, of course, it might be shown that ten drinks (or even fewer) in seven hours did actually deprive a driver of his normal faculties. But we believe it necessary to have proof of the fact of impairment of faculties.
Rike’s testimony was that he “was having a good time” as a result of the drinks he had, although, he says, normally he is “rather sober, to an extent strait-laced.” *193 His testimony does not suggest that there was any other indication whatsoever of his drinking having affected him, although he also testified he was “quite elated” he didn’t get a traffic court summons for drunken driving after the accident. On this last point, however, his testimony is somewhat in conflict with an earlier statement to a Miss Field (a “good friend” of Rike and plaintiff), that he had not been drinking to any great extent. Miss Field’s testimony was as follows:
({ * * *
“Q. Do you recall whether or not Mr. Rike ever told you how this accident had occurred ?
“A. Yes. In fact, it was the first evening I went to visit the hospital, Mr. Rike came in right after I had arrived in his wheel chair, and he told me that they were driving down Canal Street and they had gotten as far as the streetcar tracks, and it seems as though there was a car coming up from the rear and that something happened, he didn’t know what, he lost control of the car and he hit the telephone post.
“Q. Did Mr. Rike tell you anything else about the accident?
“A. Well, the only thing about, naturally I said to them, ‘Well, what had you all been drinking?’ He said, ‘Well, not to any great extent.’ He said, ‘That’s why I couldn’t understand why it happened.’
“Q. Did he indicate to you whether or not he was intoxicated at the time of the accident?
“A. I was given the general impression that he was not.
“MR. LOEB:
“Objection, if your Honor please.
“THE COURT:
“I sustain the objection. State his words, don’t draw your own conclusions. You have a right to say what he said in his words not your own opinion.
“BY THE COURT:
“Q. Did he say he was intoxicated or did he say he was not or did he say anything about that?
“A. As near as I can remember, your Honor, he said that he was not intoxicated.”
Plaintiff’s testimony was that at no time during the evening was Rike’s speech slurred or incoherent; that he was not staggering, not glassy-eyed; his face was not flushed; and he seemed perfectly normal.
Officer Walter C. Behrens, the investigating policeman, testified that when he arrived at the scene of the accident, Rike’s speech was not slurred and he was not incoherent, and that he showed no signs or indications of being intoxicated, although he did have an odor of alcohol on his breath. Officer Behrens’ testimony is here reproduced, in pertinent part:
“Q. Did you speak to the driver of the car?
“A. I did.
“Q. Do you recall what, if anything, that he said to you?
“A. He stated that he was driving on Canal Street at about 35 miles an hour and upon reaching that location his vehicle veered off of the roadway after striking— after running over streetcar tracks caused him to lose control.
“Q. At the time that you spoke to him was his speech slurred?
“A. No, sir, it wasn’t.
*194 “Q. Was he coherent?
“A. He was, he was in pain, he had been injured in the accident.
“Q. Was he ambulatory, was he walking around?
“A. No, sir, he was lying on the ground next to his automobile.
“Q. Did he show any signs or indications of being intoxicated at the time?
“A. No, sir, he did not.
* * * * * *
“Q'. Do you recall whether he was issued any citation?
“A. Yes, sir, he was issued a citation for reckless driving causing damage and injury and also one for not having any current brake tag on his vehicle.”
******
“Q. In your conversation with Mr. Rike did you ask him whether he had had a drink?
“A. Yes, he admitted — he stated that he had a couple of drinks.
“Q. Did you ask him how many he had?
“A. I don’t recall that, sir.
“Q. Did you ask him where he had been?
“A. He stated that he had been to the French Quarter.
“Q. Did you ask him how long he had been in the French Quarter?
“A. I don’t recall asking him that.
“Q. Did you detect alcohol on his breath ?
“A. He did have an odor of alcohol on his breath.
“Q. Did you ask him anything more than you told us about how the accident happened?
“A. I believe I covered it.
“Q. Did you determine from Mr. Rike whether or not his car or this car that he was driving was the only automobile involved in the accident?
“A. Yes, sir, that was the only automobile involved in the accident.”
The only other testimony claimed by defendants to be relevant to Rike’s state was that of the piano player from the first lounge, and that of a companion who met plaintiff and Rike at the first lounge and stayed with them until shortly before the accident.
The statement by the piano player upon which defendants rely was, “Well, I usually tell them, everybody when they are going, say goodnight, see you later, and I remember I told Jim (Rike) too if he was going out to another place and going to drink some more just take a taxi but I usually do that to everybody, you know, I’m always a good Sam.” In our view this testimony proves nothing more than that the piano player said what he claims to have said. His other testimony is firm in denying that he saw any suggestion of Rike’s being under the influence of alcohol, except that he was “having a good time.”
The companion’s testimony is, in our view, likewise not probative of anything, except that the companion had three drinks at the first lounge, ■ one of which he had with plaintiff and Rike, and about three or four at the second lounge. At the second lounge plaintiff and Rike “were sitting down and it was crowded where I couldn’t get a seat * * * ” The companion did not testify at all about any act by Rike which would suggest that Rike was under the influence of alcohol.
Thus the only evidence in the entire record which supports a conclusion that Rike was materially under the influence of alcohol is Rike’s own testimony. That testimony is weak when considered by itself; and is contradicted by Rike’s own state *195 ments to Miss Field. We believe defendants have failed to show that Rike was materially affected by his drinking, and their failure of proof is accentuated by the contrary testimony of plaintiff and Officer Behrens.
But more clear, in our view of the record, is the conclusion that no abnormal action on Rike’s part gave plaintiff any indication that Rike was not in possession of his normal mental and physical faculties, or that they had been so impaired as to render it imprudent to ride with him at the wheel of the car.
The cases defendants have cited are distinguishable from the present matter. Otis v. New Orleans Public Service, Inc., supra, as shown by the companion case, Hooker v. New Orleans Public Service, Inc., 127 So.2d 199 (La.App.1961), involved a driver who was driving on a city street in New Orleans at a speed estimated as between 40 and 65 miles an hour, zigzagging from one side of the street to the other; and even after arrival at the hospital, according to hospital record, had been “drinking ‘heavily’,” and was “hard to arouse.” Plaintiff and the driver in the Otis case had been drinking together for some time prior to the accident, and plaintiff was held charged with knowledge of the driver’s state.
In Elba v. Thomas, supra, the driver was too dazed to know where the accident happened, was glassy eyed and staggering as though drunk, and was driving at an excessive speed at night without headlights, from which circumstances the court found “the conclusion is inescapable that he was intoxicated at the time and that his intoxication was one of the contributing factors to the accident.”
In Woods v. King, 115 So.2d 232 (La.App.1959), the court found the most reliable evidence to be that of the investigating police officer, who testified the driver did not want to go to the hospital (though so severely injured as to require removal upon a stretcher); that she was talking thick-tongued and her eyes were glassy; that she was heavily under the influence of liquor.
Perhaps the most reliable evidence in this case, too, is that of the disinterested police officer, recited above, to the effect that the driver here manifested no indication (other than alcohol on the breath) of being intoxicated.
We conclude that defendants have failed, by the preponderance of the evidence, to establish their affirmative defense, and that the judgment dismissing plaintiff’s suit must be reversed.
On quantum, we find uncontra-dicted evidence of past medical expenses of $1,059.15, and of future expense for plastic surgery to ameliorate a large facial scar in the amount of $1,250.00.
The scar has existed since the time of the accident and will remain, albeit improved by plastic surgery. The scar is described as being medial to the inner canthus of the right eye, continuing upward and toward the midline, crossing the midline at eyebrow level, and going upward parallel to the medial end of the left eyebrow. It is about six centimeters in length and two or three millimeters in width, but a depression under the scar makes it more conspicuous. Two smaller scars branch off the main scar. Plaintiff is 45 years of age and has once been married. We believe $2,500.00 is an appropriate amount to remedy, insofar as money may do, this disfigurement.
For her pain and suffering we conclude plaintiff should recover a total of $7,500.00. The pain and suffering resulted from lacerations of the forehead, a compound frontal skull fracture, concussion, two fractured ribs, considerable abrasions and contusions upon her upper and lower extremities, and, for a period after operation, diplopia. The operations and procedures necessary to treat her kept her in *196 the hospital fifteen days and caused her to spend approximately three or four months recuperating before resuming employment, although in fact she did not suffer loss of wages during that period. She must undergo a further operation in an effort to remedy the disfiguring scar.
The total of plaintiff’s damages thus amounts to $12,309.15. However, the limit of the policy issued by The American Insurance Company is $5,500.00. Accordingly, the judgment appealed from is reversed, and it is now ordered, adjudged and decreed that there be judgment herein rendered in favor of plaintiff, Mrs. Clarice Addington, and against defendants, James L. Rike and The American Insurance Company of Newark, N. J., in solido, in the amount of five thousand five hundred ($5,500.00) dollars, together with legal interest from judicial demand until paid; and further judgment in favor of plaintiff and against James L. Rike in the sum of six thousand eight hundred nine and Wioo Dollars ($6,809.15), together with legal interest from date of judicial demand until paid. Costs are to be divided between defendants.
Reversed and rendered.